IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| INTELSAT USA SALES CORPORATION,<br>    A Delaware Corporation,<br><br>    3400 International Drive<br>    Washington DC  20008<br><br><br>        Plaintiff,<br><br>v.<br><br>WEST COAST FACILITIES INC.,<br>    formerly known as Penthouse Media<br>     Group (CA) Inc.<br>    6800 Broken Sound Parkway NW<br>    Suite 100<br>    Boca Raton, FL  33487<br><br><br>        Defendant.<br><br>    Serve:<br>    Corporation Service Company<br>    1201 Hays Street<br>    Tallahassee FL 32301-2525<br>    Registered Agent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CA No. _____ |

## **COMPLAINT**

Plaintiff Intelsat USA Sales Corporation, by counsel, files this Complaint against defendant West Coast Facilities Inc., formerly known as Penthouse Media Group (CA) Inc. ("Penthouse"), and pleads as follows:

1.   Plaintiff Intelsat USA Sales Corporation ("Intelsat USA") is a Delaware corporation with its principal place of business in the District of Columbia.

2. Defendant Penthouse is a California corporation with its principal place of business in the State of Florida.

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332, as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

4. Jurisdiction and venue in this Court is proper, as defendant has breached its contract with plaintiff in the District of Columbia, and defendant has also irrevocably consented to the jurisdiction of this court. Exhibit 1, ¶ 13.

5. On December 28, 2005, Intelsat USA and Penthouse entered into a Nonexclusive Service Agreement ("NSA"). A copy of the NSA is attached hereto as Exhibit 1. Under the terms of the NSA, Intelsat USA agreed to provide Penthouse with certain telecommunications services commencing October 21, 2007 and ending August 1, 2018. Penthouse agreed to pay Intelsat USA's charges and fees for such services as described in the Service Contracts made part of the NSA, and agreed to pay all invoices issued by Intelsat USA for such services.

6. On April 13, 2007, Penthouse wrongfully and without cause repudiated the Agreement.

7. Plaintiff was and is ready, willing and able to provide telecommunications services to defendant pursuant to the NSA and the Service Contracts, and to perform all its obligations under the NSA and the Service Contracts. Plaintiff has been damaged as a result of Penthouse's wrongful repudiation of the NSA and Service Contracts.

8. Penthouse's anticipatory breach of the NSA and the Service Contracts entitles plaintiff to recover all damages flowing from the breach, including the present

value of its damages from Penthouse's breach of the total NSA and all Service Contracts between plaintiff and defendant.

## COUNT ONE

(Anticipatory Breach of Contract)

9. Plaintiff incorporates the allegations of paragraphs 1 through 8 above.

10. Defendant has anticipatorily breached the terms of the NSA and the Service Contracts by its wrongful repudiation of the NSA and Service Contracts.

11. Plaintiff has been damaged as a result of defendant's breaches.

## COUNT TWO

(Quantum Meruit/Unjust Enrichment)

12. Plaintiff incorporates the allegations of paragraphs 1 through 11 above.

13. Plaintiff has conferred benefits on defendant by reserving telecommunications services for defendant's use.

14. Defendant was aware of the benefits conferred by plaintiff, and has accepted those benefits.

15. It would be inequitable for defendant to retain such benefits without compensation to plaintiff.

16. Plaintiff has been damaged as a result of defendant's failure to pay for the benefits conferred on defendant by plaintiff.

WHEREFORE plaintiff Intelsat USA Sales Corporation demands judgment in its favor against defendant West Coast Facilities, Inc. in the amount of $7,377,244.77, or an

amount proven at trial, together with interest, its costs herein, and its attorneys' fees, and such other relief as to the Court seems proper.

        INTELSAT USA SALES CORPORATION
        By Counsel


_____/s/_____
David I. Bledsoe
Bar No 422596
300 North Washington Street
Suite 708
Alexandria, VA  22314
703-379-9424
703-684-1851(fax)
bledsoelaw@earthlink.net

Contract Number: 04322-000
Customer Number: 36708

**EXECUTION DOCUMENT**

NON-EXCLUSIVE SERVICE AGREEMENT ("Agreement") DATED THIS 29th DAY OF December 2005 (the "Effective Date") for the supply of Services BY AND BETWEEN

**INTELSAT USA SALES CORP.** ("Intelsat"), a company incorporated under the laws of the State of Delaware with offices at 3400 International Drive, N.W., Washington, D.C. 20008; **AND PENTHOUSE MEDIA GROUP (CA) INC.**, a company incorporated under the laws of the State of California with offices at 2709 Media Center Drive, Building 1, Los Angeles, CA 90065 (the "Customer"). Intelsat and the Customer shall each be referred to herein individually as a "Party" and collectively as the "Parties".

**THE PARTIES HEREBY AGREE AS FOLLOWS:**

**1. TERM**

This Agreement shall start on the Effective Date and last for five years and continue thereafter until terminated by either Party giving the other Party 90 days' written notice, but this Agreement shall not in any event terminate or expire until the expiration or termination of any Service Contract governed by this Agreement.

**2. THE SERVICES**

2.1 The Customer may purchase services from Intelsat during the Term. Intelsat may, at its sole discretion and without giving any reason, refuse to accept any such request for services. If Intelsat agrees, the Parties shall enter into a binding Service Contract under this Agreement for the supply of the service ("Service"), which shall specify the terms for the provision of the Service and take precedence over this Agreement. The terms of this Agreement shall apply to any Service Contracts for the duration of such Service Contracts (even if such exceeds the Term).

2.2 The services Intelsat offers are at https://ibn.intelsat.com/service_contracts (Service Descriptions and Addenda). Intelsat may from time to time amend or withdraw any Service Descriptions, Restoration Policy, Technical Guidelines and Operating Procedures or other guidelines, procedures and policies generally applicable to its customers, always provided that any such amendment or withdrawal shall not apply to existing Services.

2.3 All services are offered on a non-exclusive basis for the Customer's own use, or for use as a component of another product for its own use, or sale to its own customers. The Customer may not otherwise distribute or resell any Services without the express written agreement of Intelsat. Notwithstanding the foregoing provisions of this Section 2.3, the Customer may provide programming and carriage services to other persons and entities, provided that the Customer shall be responsible to Intelsat for such programming pursuant to this Agreement as if it were the Customer's own.

2.4 The Customer shall be responsible, at its own expense, for interconnection with the Services at the Service Demarcation Points (SDP) specified in a Service Contract. Intelsat shall have no liability for Services beyond these points.

2.5 The Customer may renew or extend a Service of 6 months or longer by giving Intelsat notice that it wishes to do so at least 90 days before the Service end date set out in the Service Contract ("SED"), subject to reaching agreement based on good faith negotiations on price and terms within 30 days of such Customer notice, provided that as long as the Customer remains engaged in good faith negotiations for the renewal or extension of such Service, Intelsat will not remarket the Satellite capacity used for that Service unless the Customer does not undertake or resume good faith negotiations within 5 days after notice from Intelsat that Intelsat intends to remarket the Satellite capacity. Intelsat will otherwise be free to remarket the Satellite capacity used for that Service.

2.6 If the Customer continues to use a Service past its SED, Intelsat may, at its sole option, cease to supply the Service, or continue to supply it at either the rate charged in the Service Contract or the then-current market rate.

**3. CHARGES AND PAYMENT**

3.1 "Charges" means all charges specified in a Service Contract or otherwise due to Intelsat pursuant to this Agreement. Recurring Charges shall be paid monthly for each month of Service by the last day of the month in which that Service has been supplied. The Customer shall pay all Charges in US$ within 30 days of the date of the invoice. Any payment not received by its due date will be subject to interest at a rate of 12% per year. All payments shall be made in full free and clear of any set-off, restriction, condition or deduction. Payments shall only be deemed received when they reach the following account: Intelsat USA Sales Corp., Citibank FSB, Washington, D.C., ABA # 254070116, Account number 15096572.

3.2 Unless the Customer notifies Intelsat of any dispute within 45 days of the date of an invoice, the invoice shall be considered final and undisputed. The Customer shall pay all undisputed amounts by the relevant payment-due date.

3.3 Intelsat may require the Customer to provide it with financial security for any Service not exceeding an amount equal to three months of fees for such Service ("Collateral") prior to Intelsat's agreement to provide such Service as security for payment of Charges and other liabilities. The Customer shall still be responsible for the timely payment of Charges. Intelsat shall be entitled to call upon any Collateral for any late payment or other liabilities that the Customer may incur, and the Customer shall be obliged to replenish the Collateral. Failure to do so will be a material breach of this Agreement. Intelsat will return any remaining Collateral to the Customer immediately after the termination of the Service Contract covering the Service once all stated liabilities pursuant to this Agreement and concerning the Service Order to which such Service relates have been paid.

3.4 The Customer shall pay any and all taxes and imposts of any nature whatsoever levied on any Service, save for taxes imposed upon or measured by Intelsat's income. If any taxes are required to be withheld from amounts payable to Intelsat, or to the extent Intelsat is required to pay or actually pays any taxes in the first instance and provides written notice to the Customer thereof, any amounts payable to Intelsat by the Customer shall be increased so that Intelsat receives the amount it would have received had no taxes been imposed.

3.5 Intelsat represents and warrants that all fees to be paid for receipt of the Services hereunder have been disclosed fully to the Customer, and that there are no additional "hidden" or other charges or fees inherent in such Services (i.e., costs or expenses to be borne by the Customer other than those specified in the applicable Service Contract or this Agreement), including without limitation any fees correlating to Satellite position maintenance.

**4. SERVICE LEVELS**

4.1 Without limiting Intelsat's other obligations pursuant to this Agreement, Intelsat will use commercially reasonable efforts to provide each Service as set out in its Service Contract, and in any

Confidential and Proprietary
US Version 001-10 February 2005

Intelsat USA Sales Corp.

JLE
1/5

Contract Number: 04322-000
Customer Number: 36708

event provide all Services with appropriate skill and expertise meeting or exceeding then-prevailing industry standards.

4.2 If a "Service Interruption" (that is a Customer-reported outage to a Service which lasts for more than 60 minutes from the time it is reported to Intelsat) occurs, following verification by Intelsat using all reasonable and good faith efforts to do so, Intelsat shall give the Customer a credit against future Charges for that Service calculated as a pro-rata proportion of the recurring monthly Charge for that Service (an "Interruption Credit"), or if the Service does or will terminate prior to the consumption of the Interruption Credit, then a cash refund of the unused balance of the Interruption Credit.

4.3 Intelsat shall not be liable for any failure to supply any Service and in no event shall Interruption Credits be given in respect of any Service Interruption that is caused by the Customer or its default or by events beyond Intelsat's reasonable control.

5.  SUSPENSION AND TERMINATION FOR DEFAULT

5.1 Intelsat may, at its option, terminate this Agreement (including all Service Contracts) or a Service Contract by notice if the Customer (i) fails to make any payment due to Intelsat within 5 days of receiving notice that such payment is late and that Intelsat intends to terminate such Service Agreement; or (ii) is otherwise in material breach of this Agreement and does not cure that breach within 30 days of receiving notice from Intelsat.

5.2 Provided that the Customer is not in material breach of any of its obligations under this Agreement, the Customer may (i) terminate this Agreement (including all Service Contracts) or a Service Contract by notice if Intelsat is in material breach of this Agreement and does not cure that breach within 30 days of receiving notice from the Customer; or (ii) terminate a Service Contract by notice if Intelsat fails to meet the relevant Service minimum performance criteria in the Intelsat Technical Guidelines and Operating Procedures applicable for the subject Service for a period greater than 7 consecutive calendar days following Intelsat's receipt of notice of such failure, whether or not such failure is due to a Force Majeure Event (as defined in Section 8.1).

5.3 Either Party may terminate this Agreement by notice if the other Party files a petition in bankruptcy not withdrawn within 30 days of its filing or is adjudicated bankrupt or insolvent, or files or has filed against it any petition or answer seeking any reorganisation, composition, liquidation or similar relief for itself under any applicable statute, law or regulation or makes any general assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due.

5.4 Intelsat may terminate this Agreement if a change in the ownership or corporate holding of the Customer results in Intelsat being in violation of any US or foreign law, regulation or order of a competent authority.

5.5 Upon termination by Intelsat, or expiration, of this Agreement (or the relevant Service Contract) for whatever reason, the Customer shall cease using the Services and the Satellite capacity. All outstanding indebtedness of the Customer to Intelsat under the Agreement shall become immediately due and payable. Further, for each Service Contract that has been terminated by Intelsat, all amounts due to be paid by the Customer to the end of that Service Contract shall immediately become due and payable. The Parties agree this is a proper assessment of the loss of bargain and damages Intelsat will incur, and is not a penalty.

5.6 Intelsat may suspend Services in whole or in part (i) if necessary to comply with any applicable laws, regulations or government orders; or (ii) if the Customer's signals are being blocked or jammed by a third party; or (iii) if an Earth Station is not in compliance with the Technical Guidelines and Operating Procedures; or (iv) in circumstances where Intelsat is entitled to terminate this Agreement for the Customer's breach; provided that as concerns (i) Intelsat gives the Customer 30 days notice prior to such suspension

(or as many days up to 30 days as applicable laws, regulations or government orders permit), as concerns (ii) and (iii) Intelsat gives the Customer as much prior notice as is reasonably practicable under the circumstances, and as concerns (iv) Intelsat gives prior notice of such suspension to the Customer as if it were a notice of breach given as prescribed in Section 5.1 and the Customer does not cure in the manner prescribed in Section 5.1. Intelsat acknowledges that the Customer's programming contains adult content, including without limitation full and explicit nudity and frank discussions of sexual and sex-related matters, and that such content shall not in and of itself provide Intelsat a basis to suspend Services, always subject to Section 5.6 (i).

5.7 Intelsat may also suspend temporarily Services by giving the Customer reasonable written notice in order to perform testing, maintenance or adjustment works. Intelsat diligently shall seek to coordinate the timing of such action with the Customer in order to minimise any interruption to Services, and shall use reasonable efforts to minimise any such suspensions. Intelsat shall use reasonable efforts to avoid scheduling testing, maintenance or adjustment works between the hours of Friday 6:00 p.m. and Monday 6:00 a.m. Eastern Time. In "Urgent Operational Cases" (that is, situations that in the reasonable opinion of Intelsat based on the information then available have caused or are likely to cause: (i) damage to the Satellites or related infrastructure of Intelsat or a third party or (ii) major and sustained interference with other services) Intelsat may suspend Services without prior notice, but shall give notice to the Customer as promptly as reasonably practicable thereafter with an explanation for the reason(s) for suspension and a timetable (updated from time to time as and if such timetable changes) for Service restoration.

6.  LIMITATION OF LIABILITY

6.1 INTELSAT WARRANTS IT WILL PROVIDE THE SERVICES WITH APPROPRIATE SKILL. ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, OTHER THAN THOSE EXPRESSLY INCLUDED IN THIS AGREEEMENT ARE DISCLAIMED BY THE PARTIES.

6.2 WITH THE EXCEPTION OF CLAIMS (I) FOR DEATH OR PERSONAL INJURY DUE TO INTELSAT'S (OR ITS AGENTS') NEGLIGENCE, AND (II) ARISING FROM INTELSAT'S (OR ITS AGENTS') GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, FOR WHICH THERE IS NO LIMITATION IMPOSED, IT IS EXPRESSLY AGREED THAT INTELSAT'S SOLE OBLIGATION AND THE CUSTOMER'S EXCLUSIVE REMEDY FOR ANY DIRECT LOSS WHATSOEVER ARISING OUT OF OR RELATING TO THIS AGREEMENT IS INTERRUPTION CREDITS, AND THE CUSTOMER AGREES THAT THESE ARE A GENUINE PRE-ASSESSMENT OF LOSS AND DAMAGE.

6.3 IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHATSOEVER ARISING OUT OF OR UNDER THIS AGREEMENT WHETHER UNDER CONTRACT, WARRANTY, TORT OR OTHERWISE, INCLUDING LOSS OF REVENUE OR PROFITS, REGARDLESS OF THE FORESEEABILITY OF SUCH DAMAGES.

6.4 THE CUSTOMER SHALL INCLUDE IN DISTRIBUTION AGREEMENTS WITH DOWNSTREAM VENDORS OF CUSTOMER PRODUCTS CARRIED VIA SERVICES PROVIDED BY INTELSAT PURSUANT TO THIS AGREEMENT DISCLAIMERS OF LIABILITY IN FAVOUR OF INTELSAT AND ITS AFFILIATES SUBSTANTIALLY SIMILAR TO (BUT IN NO CASE LESS BROAD THAN) THOSE SET FORTH IN THIS SECTION.

7.  INDEMNIFICATION

7.1 The Customer shall be liable for and shall indemnify and hold harmless Intelsat (including any affiliate, or director, officer, employee or agent of Intelsat or its affiliates) from and against any direct or

Confidential and Proprietary
US Version 001-10 February 2005

2

Intelsat USA Sales Corp.



Contract Number: 04322-000
Customer Number: 36708

indirect loss, damage, liability or expense arising from any claim by a third party that is not an affiliate of Intelsat in connection with the provision of Services and arising out of or in connection with: (i) the fault or negligence or breach of this Agreement by the Customer; or (ii) the Customer's breach of any national laws, rules and regulations applicable to it; or (iii) the Customer's or any third party end-user's use of the Services, regardless of cause by the Customer, its affiliates or customers, including any claims relating to the information or content of programming or other material displayed or transmitted, but excluding the "Intelsat Indemnified Matters" (defined in Section 7.3)

7.2 The Customer also shall be liable for and shall indemnify and hold harmless Intelsat from and against any loss or damage to Intelsat's Satellites or related Intelsat provided infrastructure and facilities that is caused by any act or omission of the Customer not directed, recommended or specified by Intelsat or its agents.

7.3 Intelsat shall be liable for and shall indemnify and hold harmless the Customer (including any affiliate, or director, officer, employee or agent of the Customer or its affiliates) from and against any direct or indirect loss, damage, liability or expense arising from any claim by a third party that is not an affiliate of the Customer in connection with: (i) the fault or negligence of Intelsat (or its representatives), or the breach of this Agreement by Intelsat; or (ii) Intelsat's breach of any national laws, rules and regulations applicable to it; or (iii) Intelsat's gross negligence or wilful misconduct; or (iv) intellectual property rights infringement or violation arising from provision, receipt or use of the Services as provided by Intelsat (collectively, the "Intelsat Indemnified Matters"), but excluding such claims to the extent arising due to the Customer's failure to perform its obligations set forth in Section 6.4.

8. FORCE MAJEURE

8.1 Neither Party shall be liable for any failure to perform under this Agreement due to any unforeseeable act, event or cause beyond its reasonable control ("Force Majeure Event") during the duration of the Force Majeure Event; provided that the party whose performance is so afflicted gives notice of such Force Majeure Event describing the circumstances and date occurrence of such Force Majeure Event, and its best estimate of the expected duration based on the information known (if any). Subject to Section 5.2, upon removal or cessation of the Force Majeure Event, all obligations under this Agreement shall resume.

8.2 [Intentionally omitted.]

8.3 [Intentionally omitted.]

9. WARRANTIES

9.1 The Customer warrants that: (i) it will only use and will procure that its customers only use the Services and/or display or transmit any information or content using or in connection with the Services in compliance at all times with all applicable laws and regulations; and (ii) it will follow established practices and procedures for frequency co-ordination and will not knowingly use the Services in a manner that could reasonably be expected to interfere with or cause physical harm to the Satellites or other services that Intelsat offers. These Warranties shall apply throughout the Term and until the SED of the last remaining Service Contract.

9.2 Each Party represents and warrants to the other Party that as of the date of this Agreement (i) it has the right, power and authority to enter into and fully perform its obligations hereunder (ii) the execution, delivery and performance of this Agreement have been duly authorised by all necessary corporate action; (iii) this Agreement constitutes legal, valid and binding obligations on that Party; (iv) it has obtained or will obtain prior to the commencement of the Services requiring them all applicable clearances and licences, consents and approvals necessary to enable it to provide (as to

Intelsat) and use (as to the Customer) the Services and to perform its other obligations under this Agreement.

9.3 Each Party represents and warrants to the other Party that it is in compliance with all applicable laws and regulations of any jurisdiction to which it is subject concerning the subject matter of this Agreement and/or one or more Service Contracts, and performance of its obligations under this Agreement and the Service Contracts will not violate or conflict with any applicable laws or regulations of any jurisdiction to which it is subject.

10. CONFIDENTIALITY

10.1 Intelsat and the Customer agree that it may be necessary to the performance of this Agreement for a Party (the "Disclosing Party") to disclose to the other Party (the "Receiving Party") Confidential Information (that is, information of a confidential or proprietary nature relating to this Agreement or a Disclosing Party, its affiliates or other representatives that is reduced to writing and marked "Confidential" or similarly, not including information (i) developed independently, or lawfully received from a third party not owing a duty or obligation of confidentiality to the Disclosing Party, or (ii) to have reached the public domain other than by a breach of this Agreement or other duty or obligation of confidentiality owed to the Disclosing Party. The Receiving Party shall use the same or higher standard of care to maintain the security and confidentiality of all Confidential Information received from the disclosing Party as the receiving Party uses in the maintenance of the security and confidentiality of its own Confidential Information, and in any event no less than reasonable care. The Receiving Party shall not, without the written consent of the other, disclose the Disclosing Party's Confidential Information to any non-employee unless such third party is made aware of the confidentiality obligations of this Agreement and either agrees to be bound by them or owes an obligation or duty of confidentiality to the Receiving Party. The Receiving Party's disclosure of the Disclosing Party's Confidential Information as required by law or other governmental authority shall not constitute a breach of this Agreement provided that the Receiving Party (i) gives prompt notice of such requirement to the Disclosing Party, (ii) cooperates with the Disclosing Party at the Disclosing Party's request and expense to protect such Confidential Information from unauthorized use and disclosure, and (iii) does not in any event disclose more of the Disclosing Party's Confidential Information than is required pursuant such law or governmental authority.

Upon termination or expiration of this Agreement, each Party shall destroy and irretrievable delete all of the Disclosing Party's Confidential Information and confirm in writing to the Disclosing Party that it has done so.

10.2 Each Party may state that the Customer is a customer of Intelsat and may publish this Agreement and the Parties' contact details as it sees fit.

11. TECHNICAL

11.1 The Customer shall make reasonable best efforts to ensure that all Earth Stations comply with the Intelsat Technical Guidelines and Operating Procedures published as of the Effective Date and promptly shall remedy any non-compliance; provided that Intelsat shall provide technical information and guidance as reasonably requested by the Customer and required to effect the Customer's remedy.

11.2 Always subject to Section 4.1, Intelsat may at any time alter the method by which it provides a Service, replace the Satellite on which Service is provided and/or manage Satellite Capacity during the term of a Service Contract, and always provided this does not result in a greater than operationally insignificant degradation in any Service below the provisions of the Intelsat Technical Guidelines and Operating Procedures applicable to the Services. The Customer agrees to operate on either sense of polarisation and across an entire frequency band or bands. Intelsat will provide reasonable

Contract Number: 04322-000
Customer Number: 36708

written notice to the Customer concerning any Service to be replaced, relocated or reconfigured with information on the alternative assignment. Intelsat will provide the equivalent performance on any replacement Satellite in terms of power and bandwidth to continue the Service. Customers are encouraged to change modulation schemes to improve their efficient use of Satellite capacity.

11.3 In cases of Satellite failure or malfunction, Intelsat shall restore affected Services as far as reasonably possible in accordance with the Restoration Policy in effect as of the Effective Date of this Agreement and posted at https://ibn.intelsat.com/service_contracts.

## 12. NOTICES

12.1 All notices under this Agreement shall be made in writing, by e-mail, fax or courier, and shall be deemed to be received upon delivery to the other Party at the above address marked as follows:

| If to Intelsat: | If to the Customer: |
|---|---|
| Intelsat USA Sales Corp. | Penthouse Media Group (CA) Inc. |
| 3400 International Drive, N.W. | 2709 Media Center Drive |
| Washington, D.C. 20008 | Building 1 |
| Telephone: (202) 944-7299 | Los Angeles, CA 90065 |
| Fax: (202) 944-8120 | Telephone: * |
| e-mail: uscontractnotices@intelsat.com | Fax: * |
| Attention: Director, Contracts | e-mail: jenglish@pmgi.com |
| | Attention: Jim English |
| | with copy (which copy shall not constitute notice) to: |
| | Penthouse Media Group (CA) Inc. |
| | 6800 Broken Sound Parkway NW, Suite 100 |
| | Boca Raton, FL 33487 |
| | Telephone: (561) 912-7030 |
| | Fax: (561) 912-1747 |
| | e-mail: jbressler@pmgi.com |
| | Attention: General Counsel |

12.2 Each Party from time to time may change its notice coordinates by giving notice to the other Party.

## 13. JURISDICTION

This Agreement shall be governed and interpreted in all respects by the laws of the State of New York and both Parties irrevocably agree that the United States District Court for the District of Columbia shall have jurisdiction to settle any dispute arising out of or in connection with this Agreement, save that Intelsat shall also have the right to take proceedings against the Customer in the national courts of the jurisdiction of the Customer's incorporation. Nothing contained in this Section shall limit any rights either Party may have to seek immediate injunctive relief against the other Party.

## 14. ASSIGNMENT

14.1 Neither Party may assign, transfer or sublease (subject to Section 2.3) any rights or obligations under this Agreement to any other person or entity without the express written consent of the other Party; provided that each Party may assign or otherwise transfer this Agreement to its affiliates or to a successor in interest to substantially all of its assets. Intelsat acknowledges that Services it provides pursuant to this Agreement are intended for the benefit of the Customer and its affiliates. The Customer acknowledges that its affiliates receiving Services pursuant to this Agreement shall be bound by the terms of this Agreement.

## 15. MISCELLANEOUS

15.1 (i) This Agreement may only be amended by written agreement of the Parties. (ii) If any provision of this Agreement is found to be invalid or unenforceable, it shall not affect the validity and enforceability of any other provision of this Agreement, and the invalid or unenforceable provision shall, if possible, be replaced with or rewritten into a provision consistent with the intentions of the Parties. (iii) [Intentionally omitted.] (iv) No waiver by either Party of any default by the other Party shall affect or impair either Party's rights in respect of any subsequent default of any kind by the other Party. Acceptance by Intelsat of any payments by the Customer shall not be deemed a waiver of any preceding breach by the Customer of any of the terms or conditions of this Agreement. No waiver shall be effective unless made in writing by a Party's authorised representative. (v) The rights, powers and remedies provided in this Agreement are cumulative and may be exercised singularly or cumulatively. (vi) This Agreement is intended for the sole benefit of the Parties and no third party (including, without limitation, customers of the Customer) may seek to enforce or benefit from this Agreement. (vii) The relationship created by this Agreement is that of independent contractors, and is in no way a partnership, principal-agent or other such relationship and the Customer warrants it will not hold itself out as entitled to bind Intelsat in any way whatsoever. (viii) This Agreement may be executed in counterparts, and by facsimile, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.

15.2 The headings in this Agreement are for convenience only and shall not affect the interpretation of this Agreement. The language of this Agreement and all other communications between the Parties regarding the performance of this Agreement shall be English. Any period of time referred to in this Agreement shall be calculated in Greenwich Mean Time. The following terms shall have the following meanings:

**Earth Station** means any antennas, switching facilities and related equipment owned or operated by the Customer that form an interconnection point with a Service.

**Including** means including without limitation, whether capitalised or not.

**Satellite** means an object, located or intended to be located beyond the earth's atmosphere, that is or will be used for radio communications owned or operated by Intelsat or an affiliate;

15.3 This Agreement (including Addenda 1 and 2, the relevant Service Descriptions, and each Service Contract into which the Parties enter, all of which are incorporated into this Agreement by reference) constitutes the entire agreement of the Parties concerning this Agreement's subject matter and supersedes all prior correspondence, representations, proposals, negotiations, understandings, and agreements of the Parties, oral or written, with respect to such subject matter.

15.4 The following provisions of this Agreement shall survive its expiration or termination: Sections 5.5, 6, 7, 10 (but only for three (3) years following such expiration or termination), and Sections 12-15 inclusive.



Contract Number: 04322-000
Customer Number: 36706

IN WITNESS WHEREOF, each of the Parties has caused a duly authorized representative to execute and deliver this Agreement.

| INTELSAT USA SALES CORP. | PENTHOUSE MEDIA GROUP (CA) INC. |
|---|---|
| Signed by: _[signature]_ | Signed by: _[signature]_ |
| Print name: PAUL KONDET | Print name: JAMES L. English |
| Title: DIRECTOR, USA SALES MGMT. | Title: Vice President |
| Date: December 21, 2005 | Date: December 27, 2005 |



## Intelsat Americas Service Order Contract
## for
## Penthouse Media Group Inc.

### EXECUTION DOCUMENT

**Service ID No:** 1-316XB   **Date Issued:** 23 December 2005

The Service ID No will be added following customer signature of this Service Order

### Intelsat Service Order:

The terms of this Service Order are valid for 5 days from its issue date, and are subject to capacity availability at the time of order. By signing and returning this Service Order to Intelsat USA Sales Corp. ("Intelsat"), the Customer is making an offer to purchase the service described in this Service Order (the "Service") from Intelsat.

When accepted agreed and signed by Intelsat, this Service Order shall become a binding Service Contract under which the Customer purchases the Service from Intelsat.

The Service is subject to the terms and conditions of that certain Non-Exclusive Service Agreement, dated as of December 27, 2005, by and between Intelsat and the Customer, as may be amended (the "Non-Exclusive Service Agreement"), except as expressly supplemented or amended in this Service Contract.

### Section 1: Commercial Terms:

| Customer Name | Penthouse Media Group Inc. |
|---|---|
| Type of service order | ☒ New Service   ☐ Change to an existing service   ☐ Renewal |
| Service Parameters | Orb. Location/Satellite: 121°W / IA-13 |
| | Priority: Inter-Satellite Protected (see Section 2.1) |
| | Bandwidth: 18 MHz |
| | Transponder/Band: C16/C-Band |
| Service charges | $72,000 per month, beginning as of the Service Commencement Date |
| Collateral amount | $216,000 (equivalent to 3 months' service charges), which shall be invoiced by Intelsat and due to be paid to Intelsat no later than the Service Commencement Date |
| Billing cycle | Concurrent |
| Service Commencement Date ("SCD") | 01 October 2007 12:00 a.m. |
| Service End Date | 01 August 2018 11:59 p.m. |

### Section 2: Additional Terms and Conditions:

2.1 For purposes of this Service Order, the **Non-Exclusive Service Agreement Service Description: Intelsat Americas Full Time Lease Services** shall be amended as follows:

Intelsat USA Sales Corp.
3400 International Drive, NW
Washington, DC 20008
USA

Page 1 of 3

2.1.1   Section 1 APPLICABILITY shall be supplemented with the following:

   The terms and conditions in this Service Description shall also apply to Inter-Satellite Protected Services for Leases on IA Satellites.

2.1.2   Section 2.1 Definitions shall be supplemented with the following:

   **Inter-Satellite Protected Service** shall mean a Lease Service that in the event of failure shall be restored on another Intelsat satellite pursuant to Section 4.3 herein, except where the failure is caused by the actions or inactions of the Customer not pursuant to the directions of Intelsat. Inter-Satellite Protected Services are not preemptible.

2.1.3   Section 4.3 shall be added as follows:

   4.3 Service Restoration for Inter-Satellite Protected Services

   In the event any Inter-Satellite Protected Service provided fails, then Intelsat shall restore such Service on comparable Satellite Capacity on IA-7 or another "cable-friendly" Intelsat Satellite then in orbit as agreed by the parties at the time. Such Satellite Capacity will become the Inter-Satellite Protected Service as of the moment of its implementation.

2.2   Unless earlier terminated by the parties in writing or in accordance with the Service Agreement, the term of this Service Order shall be binding immediately as of its full execution and shall end on the Service End Date. The Service shall commence on the Service Commencement Date.

2.3   If, within 60 days of the date of full execution of this Service Contract, the Customer does not reach an agreement with an uplink provider, the Customer may at its option revise its Service Commencement Date to 01 June 2006 in transponder C09 of IA-13. In such event, all other parameters of the Service as described herein would remain unchanged. Additionally, Intelsat agrees to work with the Customer and negotiate in good faith as is reasonable and as is consistent with Intelsat's applicable Service Descriptions, Technical Guidelines and Operating Procedures and Restoration Policy in the event that the Customer's arrangement with an uplink provider requires revisions to this Service Order.

The Customer acknowledges that all of the information contained in this Service Order is proprietary and confidential to Intelsat.

| Customer signature: | | Intelsat signature: | |
|---|---|---|---|
| Name: | *James L. English* | Name: | PAUL KONDRT |
| Title: | Vice President | Title: | DIRECTOR, USA SALES MGMT. |
| Date: | 12/27/05 | Date: | 28 DECEMBER 2005 |

*Customer Signature*

# Intelsat Americas 13
# Performance Parameters for
# Penthouse Media Group Inc.

### Parameters

| | |
|---|---|
| Capacity Block Size | 18 MHz (i.e., one-half of a 36 MHz transponder) |
| Proposed Transponder Assignment | IA-13 / C16 |
| Transponder Connectivity & Coverage | CONUS |
| Transponder Center Frequency (up/down) | To be provided no later than 45 days prior to SCD* |
| Transponder Bandwidth (nominal) | 36 MHz |
| Uplink Polarization | Horizontal |
| Downlink Polarization | Vertical |
| Satellite Saturation Flux Density (@BP) | $-96.0$ dBW/m$^2$ with 0 PAD |

### Capacity Minimum Standards

| | |
|---|---|
| Transponder Backoff (input/output) | 5.0 / 3.5 dB |
| Customer Aggregate Output Back-Off | 5.0 dB |
| Power Equivalent Bandwidth | 18 MHz |
| Allocated Bandwidth | 18 MHz |
| Adjacent Satellite Isolation (2-way) | To be provided no later than 45 days prior to SCD* |
| Co-Channel Isolation (2-way) | To be provided no later than 45 days prior to SCD* |
| Intermodulation Level | To be provided no later than 45 days prior to SCD* |

*subject to prior approval by Intelsat of Customer's Transmission Plan filing

### Notes:

For all carriers used within this block of capacity, Penthouse Media Group Inc. must file for a Transmission Plan with Intelsat at least three (3) days prior to service activation.

The Transmission Plan filing must include sufficient data to perform link calculations, such as information rate, modulation type, threshold Eb/No values, and link availability for each carrier. Intelsat will within three (3) business days of receipt of such data give notice to Penthouse Media Group Inc. of any further data that Intelsat requires.

The Transmission Plan formally issued by Intelsat includes a Carrier ID number for each carrier to be used within this capacity block. Customers will not be permitted to access the satellite without valid Carrier IDs.

Specific transponders and blocks of frequency described above are subject to availability and can be changed by Intelsat, subject to the terms and conditions of the Non-exclusive Service Agreement entered by Intelsat and Penthouse Media Group Inc.

Stated transponder backoffs for single and multi-carrier operation are standard values. In special cases, more optimum values can be selected according to customer needs, conditional upon the requirements of other satellite traffic.

Intelsat shall maintain the satellite providing the Service at 121° W ±0.05 degrees throughout the term of the Service. Intelsat acknowledges that any failure by the Customer to perform its obligations under this Service Contract or the Non-exclusive Service Agreement due to Intelsat's failure or inability to so maintain the satellite shall not constitute a breach by the Customer of this Service Contract or the Non-exclusive Service Agreement.

Intelsat USA Sales Corp.
3400 International Drive, NW
Washington, DC 20008
USA

Page 3 of 3



JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| INTELSAT USA SALES CORPORATION<br>3400 International Drive<br>Washington, DC 20008 | West Coast Facilities Inc. (formerly known as Penthouse Media Group (CA) Inc.)<br>6800 Broken Sound Parkway NW, Suite 100<br>Boca Raton, FL 33487 |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>DAVID I. BLEDSOE<br>300 N. Washington St., Suite 708<br>Alexandria, VA 22314<br>(703) 379-9424 | Case: 1:07-cv-01443<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 8/9/2007<br>Description: Contract |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
⊙ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ⊙ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ⊗ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>⊗ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- (⊗) 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 U.S.C. 1332; BREACH OF CONTRACT/QUANTUM MERUIT

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ $7,377,244.77   Check YES only if demanded in complaint
JURY DEMAND:   YES ☐   NO ⊗

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ⊗   If yes, please complete related case form.

DATE 8/8/07   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.